Joe Angelo (Bar #268542)
jangelo@gajplaw.com
Gale, Angelo, & Johnson, P.C.
2999 Douglas Blvd., Ste. 111
Roseville, CA 95661
916-290-7778 ph
916-282-0771 fax

Attorney for Plaintiff
Laura Hoffmann

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| LAURA HOFFMANN<br><br>                    Plaintiff,<br><br>     v.<br><br>Experian Information Solutions, Inc.; Equifax Information Services, LLC; TransUnion, LLC; Nelnet Servicing, LLC<br><br>                    Defendants. | CASE NO.   8:24-cv-01448<br><br>COMPLAINT FOR DAMAGES:<br><br>   1. Violation of Fair Credit Reporting Act |

COMES NOW Plaintiff Laura Hoffmann (hereinafter "Plaintiff"), an individual, based on information and belief, to allege as follows:

## **INTRODUCTION**

1. This case arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), 15 U.S.C. § 1681e(b), 15 U.S.C. § 1681i(a)(2)(A)), 15 U.S.C. § 1681i(a)(4)), and 15 U.S.C. §1681i(a)(5)(A)).
2. Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or

incomplete reporting of Plaintiff's discharged unsecured loan with Nelnet Servicing, LLC (hereinafter "NSLLC")

3. Here, NSLLC continues to report inaccurate and incomplete information regarding Plaintiff's account.
4. NSLLC's reporting of the account is wholly incomplete and misleading.
5. Specifically, NSLLC continues to inconsistently report the account as follows:
    a. TransUnion: Lists an outstanding balance of $93,905 despite the loan being included/discharged in bankruptcy.   Lists loan as open with no indication it was included in bankruptcy.
    b. Equifax: Lists an outstanding balance of $94,314 despite the loan being included/discharged in bankruptcy.   Lists loan as open with no indication it was included in bankruptcy.
    c. Experian:  Reported the loan as having an outstanding balance of $93,481 and open despite the loan being included/discharged in bankruptcy.
6. NSLLC's reporting is inaccurate and incomplete – Plaintiff discharged the NSLLC loan through her chapter 7 bankruptcy and NSLLC consented to such a discharge.
7. Such reporting is misleading and adversely impacts Plaintiff's credit worthiness.
8. Plaintiff's credit reports have been disseminated to third parties.
9. Plaintiff's credit has also been damaged as a result of the inaccurate and misleading reporting and NSLLC has continued to report the past-due balance for months after Plaintiff's bankruptcy discharge was entered.
10. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting.  Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting

methods undermine the public confidence, which is essential to the continued functioning of the banking system.

11. Creditors know that by deviating from recognized credit reporting standards consumers will have difficulty raising their credit scores and improving their credit worthiness.

## JURISDICTION & VENUE

12. Plaintiff re-alleges and incorporates herein by reference the allegations in each and every paragraph above, fully set forth herein.
13. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, and 15 U.S.C. § 1681.
14. This venue is proper pursuant to 28 U.S.C. §1391(b)(1).

## GENERAL ALLEGATIONS

15. Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.
16. Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can and often does result in denial of credit, higher interest rates, and prompts those making credit decisions to draw a more negative inference from the reported data than if the Defendant reported in accordance with the recognized industry standard.
17. Plaintiff alleges that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for credit reporting industry standards in an attempt to purposefully undermine Plaintiff's attempt to improve her FICO Score.
18. In the alternative Plaintiff alleges that the actions of each and every Defendants were the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

//
//

**FICO, Inc.**

19. FICO is a leading analytics software company with its principal headquarters located in Montana.

20. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.

21. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.

22. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

23. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

24. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

25. There are 28 FICO Scores that are commonly used by lenders.

26. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies (CRAs).

27. The three largest CRAs are Experian Information Solutions, Inc., Equifax Information Services, LLC, and Transunion, LLC.

28. FICO does not control what information is provided in a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.

29. There are five key factors that a FICO Score considers: 1) Payment History, 2) Amount of Debt, 3) Length of Credit History 4) New Credit and 5) Credit Mix.

30. Each of the five factors is weighed differently by FICO.
31. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.
32. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments.  The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score.
33. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.
34. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.
35. FICO Scores are entirely dependent upon information provided by data furnishers (DFs) to CRAs.

### e-OSCAR

36. E-OSCAR is the web-based Metro 2 compliant system developed by Experian Information Solutions, Inc.; Equifax Information Services, LLC; TransUnion, LLC and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.
37. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification (ACDV) via e-Oscar to the DF.
38. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g. "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

//
//

**Metro 2**

39. The Consumer Data Industry Association is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.

40. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumer's credit history.

41. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.

42. The credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.

43. The CDIA is *the* expert on accurate credit reporting. In support of his allegations Plaintiff avers the following:
    a. The CDIA offers a FCRA certificate program for all CRAs.
    b. The CDIA offers a FCRA awareness program for all CRAs.
    c. The CDIA offers a FCRA Certificate program for DFs.
    d. The CDIA offers a FCRA awareness program for DFs.
    e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.
    f. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Transunion.
    g. The CDIA developed a credit reporting resource guide for accurately reporting credit.

44. The CDIA's Metro 2 is accepted by all CRAs.
45. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide (CRRG).
46. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.
47. The three main credit bureaus helped draft the CRRG.
48. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.
49. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.
50. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower a consumer will be considered a higher credit risk resulting in less favorable lending terms.
51. All three major CRAs are members of the CDIA.

**Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

52. When a consumer files for bankruptcy certain credit reporting industry standards exist.
53. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.
54. The Consumer Information Indicator ("CII") is a critical field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.
55. Under Metro 2 the CII must be reported only on the consumer to whom the information applies.

56. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.
57. In the consumer bankruptcy context CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.
58. The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed but the chapter is undesignated/unknown.
59. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.
60. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.
61. The lack of a reported CII makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.
62. The lack of a CII reported also suggests that creditors are free to collect against a consumer as an individual or that no stay exists to prevent *in personam* collection activity.
63. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.
64. The more time that has passed since the filing of the bankruptcy, the less negative impact the bankruptcy will have on a consumer's FICO Score.
65. Failure to reference the bankruptcy filing (CII field) and/or the correct petition date shall result in a lower FICO Score resulting in those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

### Plaintiff's Dispute

66. Plaintiff filed for bankruptcy protection on March 1, 2023.

67. She received her chapter 7 discharge on December 10, 2023.
68. During the pendency of her bankruptcy proceeding Plaintiff filed a lawsuit in order to discharge her student loans.
69. A judgment was ultimately entered that granted the discharge of Plaintiff's student loans pursuant to 11 U.S.C. § 523(a)(8).
70. Plaintiff subsequently ordered a credit report from Experian, Equifax, and TransUnion to ensure proper reporting by Plaintiff's creditors.
71. Plaintiff noticed various delinquent and adverse trade lines on her post-discharge credit report - NSLLC was not reporting complete information regarding her account in light of the discharge.
72. Specifically, instead of reporting the discharge, NSLLC reported inconsistent, inaccurate, and misleading balances to Experian, TransUnion, and Equifax.
73. In response, Plaintiff disputed the NSLLC tradelines with Experian, Equifax, and TransUnion via certified mail in April of 2024.
74. Plaintiff's dispute letters specifically put the Defendants on notice that the account was discharged in bankruptcy and that the proper CII should be listed instead of any outstanding account balance.
75. Plaintiff's dispute letter specifically stated that the NSLLC account should be listed as included/discharged in bankruptcy.
76. Plaintiff included a copy of the consent judgment with her dispute letters to support her claims.
77. Plaintiff is informed and believes that each CRA received Plaintiff's dispute letter and in response sent Plaintiff's dispute to NSLLC via an ACDV through e-OSCAR.
78. In late May of 2024 after the statutory time period had elapsed for Plaintiff to receive a reinvestigation report from the credit Bureaus, Plaintiff ordered a second credit report from Experian, Equifax, and TransUnion for

the sole purpose to ensure Plaintiff's accounts with NSLLC had in fact been updated.

### Inaccuracy – NSLLC

79. Plaintiff was frustrated to see that Defendant NSLLC did not properly update the account.
80. NSLLC was still reporting outstanding balances were owed on the account rather than listing it as included/discharged in bankruptcy.
81. NSLLC continued to report that the account was charged-off and transmitted inaccurate information regarding the history of the account.
82. NSLLC reported to Experian, TransUnion, and Equifax that nearly $94,000 was owed and outstanding rather than updating the account to reflect that it was discharged in bankruptcy.
83. NSLLC's inaccurate reporting continued (and still continues) for months after entry of Plaintiff's discharge.
84. NSLLC's reporting is entirely incomplete, misleading and technically inaccurate.
85. The reporting is incomplete because the report lacks any updates on the account to reflect the proper CII.
86. Such reporting remains wholly incomplete and would lead lenders to question whether Plaintiff discharged her liability to NSLLC or if she otherwise owes nearly $94,000.

### Willfulness

87. This was not a negligent act by the NSLLC but instead an intentional act to purposefully undermine Plaintiff's ability to effectively restore her credit.
88. NSLLC's reporting makes Plaintiff appear less credit worthy because the lack of any update on the account makes it appear that Plaintiff is still liable for the alleged outstanding balance.

89. NSLLC's reporting is intended to pressure Plaintiff to make a payment on the account that is not otherwise required.
90. NSLLC knows that its reporting must be accurate and complete.
91. NSLLC, with knowledge of Plaintiff dispute, chose not to update Plaintiff's credit report and report the correct CII.
92. Such a scheme directly undermines the integrity of the credit reporting system at large.
93. NSLLC's inaccurate reporting continued even after receiving notice of Plaintiff's dispute; its actions run afoul of both the bankruptcy code and FCRA.

**Damages**

94. As a result of the incorrect reporting, Plaintiff has suffered economic loss, diminished credit, and emotional harm.
95. Plaintiff's emotional harm has manifested in restlessness, anxiety, nervousness, and sleeplessness.
96. NSLLC's inaccurate reporting has been transmitted to third parties and negatively impacted Plaintiff's ability to obtain and rebuild her credit.
97. NSLLC's reporting has diminished Plaintiff's credit score.
98. The actions of Experian, Equifax, TransUnion, and NSLLC as alleged herein are acts in violation of the Fair Credit Reporting Act.

**FIRST CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
Against Defendants Experian, TransUnion, and Equifax)

**Experian, TransUnion, and Equifax – Failure to Assure Credit Reporting Accuracy.**

99. Plaintiff realleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

100. Experian, TransUnion, and Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files it published and maintained concerning Plaintiff.

101. Had Experian, TransUnion, and Equifax maintained reasonable procedures to assure maximum accuracy Equifax would never have allowed the NSLLC to report the account as described herein.

102. Even assuming Experian, Equifax, and TransUnion are not sophisticated enough to address this obvious contradiction, Plaintiff disputed the account and the CRAs still did not fix the issue.

103. Plaintiffs informed Experian, TransUnion, and Equifax that the information reported by NSLLC was incorrect because Plaintiff provided information regarding the bankruptcy filing and subsequent discharge.

104. Plaintiff included a copy of the consent judgment with her dispute to further support her claims.

105. Thus, Plaintiff did not ask any CRA to adjudicate her dispute. Instead, Plaintiff provided each CRA a judgment that unequivocally showed each CRA the reporting being allowed was legally and factually inaccurate.

106. In addition, Experian, TransUnion, and Equifax's own records indicate both were aware of Plaintiff's bankruptcy filing and subsequent discharge, yet did nothing to fix the inaccurate reporting.

107. Instead, the account remains unchanged.

108. As a result of Experian, TransUnion, and Equifax's violation of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: diminished credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**Willfulness**

109. The violations described herein by Experian, TransUnion, and Equifax were willful, specifically the Credit Bureaus have intentionally and purposefully set up a system where inaccuracies are not only probable but inevitable.
110. In 2012 the FTC reported that 1 in 5 consumer credit reports contains a material error.
111. Such a finding should shock the conscience.
112. When those errors are disputed Experian, TransUnion, and Equifax intentionally sends consumer disputes to employees who do not live within the continental United States.
113. This is intentionally done to hide and or subvert a consumer's ability to confront individuals directly responsible for approving accurate reporting.
114. Such a policy also inevitably leads to disputes going unresolved as these employees receive little to no training concerning how to accurately report consumer debt.
115. Instead, these employees are simply instructed to parrot whatever information a data furnisher provides regardless of whether or not that information is accurate. *See Saez v. Trans Union,* LLC, 621 F. Supp. 2d 1074, 1083, 1088 (D.Or. 2007); *Grigoryan v. Experian Info. Sols*., Inc., 84 F. Supp. 3d 1044, 1091 (C.D. Cal. 2014); *Haykuhi Avetisyan v. Experian Info Sols*., No. CV 14-05276-AB (ASX)
116. Experian, TransUnion, and Equifax employees are regularly expected to review and approve over 90 disputes per day rendering less than five minutes to review, investigate, and respond to each dispute received.
117. Experian, TransUnion, and Equifax have intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

118. Experian, TransUnion, and Equifax allowed NSLLC to report the account with inaccurate information despite specifically being told in the dispute letter why the information NSLLC was reporting was incorrect.
119. In addition, Plaintiff provided Experian, TransUnion, and Equifax a judgment to illustrate Plaintiff was not asking any CRA to adjudicate a legal dispute.
120. All three credit reporting agencies have argued in other cases they are not positioned to adjudicate legal disputes for consumers but here when presented with a judgment addressing specifically the underlying inaccuracy, Experian, Equifax, and TransUnion failed to update or otherwise fix the inaccurate tradeline.
121. Such actions by the credit reporting agencies raise institutional concerns about prior arguments made by the credit reporting agencies and whether those agencies actually review evidence presented by consumers.
122. Despite Experian, Equifax, and TransUnion having actual knowledge of Plaintiff's bankruptcy, discharge, and judgment, Experian, TransUnion, and Equifax all continued to allow NSLLC to report the account with an outstanding balance and no CII reference.
123. Consequently, Defendants Experian, TransUnion, and Equifax are liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.
124. In the alternative, Experian, TransUnion, and Equifax were at least negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.
125. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian, TransUnion, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

//

//

## SECOND CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
Against All Defendants)

**TransUnion, Experian, and Equifax – Failure to Reinvestigate Disputed Information.**

126. Plaintiff re-alleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

127. After Plaintiff disputed the account mentioned above, TransUnion, Experian, and Equifax were required to conduct a reasonable investigation and to delete any information that was not accurate under 15 U.S.C. § 1681i-(a)1.

128. TransUnion, Experian, and Equifax failed to conduct a reasonable investigation and failed to correct the misleading and/or inaccurate statements on the account within the statutory time frame or at all.

129. TransUnion, Experian, and Equifax could not have possibly done any type of reasonable investigation into this matter as Plaintiff explicitly explained that the NSLLC account reporting was inaccurate due to the bankruptcy discharge.

130. Plaintiff further included verification that the NSLL debt was discharged in her bankruptcy filing yet Experian, TransUnion, and Equifax intentionally ignored Plaintiff's dispute and supporting documents.

131. Plaintiff alleges that TransUnion, Experian, and Equifax each have its own independent duty to conduct a reasonable investigation 15 U.S.C. § 1681i-(a)1.

132. TransUnion, Experian, and Equifax are not passive entities bound to report whatever information a DF provides.

133. Given the aforementioned, Plaintiff allege that TransUnion and Equifax can and do suppress inaccurate information from being reported when DFs provide inaccurate information.

134. TransUnion, Experian, and Equifax can and do instruct DFs on how to properly report certain accounts from time to time upon request from the DF.

135. TransUnion, Experian, and Equifax failed to conduct a reasonable investigation because any basic investigation would have included a review of Plaintiff's dispute letters.

136. TransUnion, Experian, and Equifax therefore did not do the most basic investigation regarding credit reporting industry standards otherwise the aforementioned would have been uncovered.

137. TransUnion, Experian, and Equifax intentionally, willfully or with reckless disregard for Plaintiff's accuracy did no investigation whatsoever given that TransUnion and Equifax's general policy is to simply parrot whatever information a data furnisher sends.

138. Such policies and procedures inherently lead to inaccurate information being reported and therefore such an investigation is wholly unreasonably and reckless i.e. willful.

## THIRD CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
Against All Defendants)

**TransUnion, Experian, and Equifax – Failure to Review and Consider All Relevant Information.**

139. Plaintiff realleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

140. TransUnion, Experian, and Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

141. As a result of TransUnion, Experian, and Equifax's violation of 15 U.S.C. § 1681i(a)(4), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

142. The violations of TransUnion, Experian, and Equifax were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

143. In the alternative TransUnion, Experian, and Equifax were negligent, which entitle Plaintiff to recovery under 15 U.S.C. § 1681o.

144. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from TransUnion, Experian, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

## FOURTH CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))
Against All Defendants)

**TransUnion, Experian, and Equifax – Failure to Delete Disputed and Inaccurate Information.**

145. Plaintiff re-alleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

146. TransUnion, Experian, and Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

17

147. As a result of TransUnion, Experian, and Equifax's violations of 15 U.S.C. § 1681i(a)(5)(A), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.
148. The violations by TransUnion, Experian, and Equifax were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.
149. In the alternative, TransUnion, Experian, and Equifax were negligent, which entitle Plaintiff to recovery under 15 U.S.C. § 1681o.
150. Plaintiff are entitled to recover actual damages, statutory damages, costs and attorney's fees from TransUnion, Experian, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rules of Civil Procedure 38, Plaintiff hereby demands a trial by jury for all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;
2. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;
3. Award attorney's fees and costs of suit incurred herein pursuant to 15 U.S.C. § 1681n & o;
4. For determination by the Court that Defendants' policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, et seq.; and

//
//

5. For determination by the Court that Defendants' policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

                                **Gale, Angelo, & Johnson, P.C.**

Dated: July 1, 2024              /s/ *Joe Angelo*
                                           Joe Angelo
                                           Attorneys for Plaintiff